# AFFIDAVIT

I, Wade R. Cochran, having been first duly sworn, do hereby depose and state as follows:

1. I am a Task Force Officer with the Federal Bureau of Investigation (FBI) and have been since November 20, 2019. In such capacity, I am authorized to investigate violations of the United States Code under Title 18 and Title 21, to include applying for search warrants before the United States District Court. I am employed by the Montpelier Police Department, and am currently assigned to the Detective Division. I was previously assigned to the Vermont Drug Task Force for over five years, from December 2013 to January 2019, and have been a Full Time Law Enforcement Officer since 2004. I have authored numerous search warrants and participated in hundreds of criminal investigations, many of which involved violations of state and federal controlled substance and firearms laws.

2. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of fourteen cellular telephone devices, described with particularity in Attachment A, which are currently stored in evidence at the Vermont State Police Barracks in St. Johnsbury, Vermont, and the extraction from the cellular phones of electronically stored information described in Attachment B.

3. Based on my training and experience I know the following:

    a. Persons who participate in the distribution of controlled substances frequently use cellular phones and other electronic devices to coordinate their unlawful activities, and to maintain contact with suppliers and consumers of illegal drugs. Phones may also be used in communications surrounding the trading of guns for illegal drugs.

    b. I know that information stored in the memories of these communications devices constitutes evidence of drug trafficking and/or the illegal movement of currency. Among other things, the evidence may contain the telephone numbers assigned to the communication devices, messages received by or sent from the devices, identification numbers and other

1

information contained in their electronic memories, and the records of telephone numbers to which calls were placed and from which calls were received.

c. With their cellular phones, drug traffickers often take photographs of other members of their organizations, assets obtained from profits of drug sales, locations associated with their illegal activity, firearms acquired or sought to protect their drugs, and other useful evidence.

d. I also know that persons engaged in such illegal activity will often deny ownership of these phones in an attempt to thwart law enforcement's efforts to connect them to more serious crimes, possible co-conspirators, and/or their sources of supply.

e. Data contained in a cellular phone may reveal the physical location of the cellular phone at various times. For example, the latitude and longitude of the camera at the time it takes a photograph will be contained in the metadata associated with the picture. Also, if a cellular phone has Global Positioning System ("GPS") capabilities (which many do), additional information regarding locations of the phone, while it follows GPS directions, may be recovered from the device.

4. The property to be searched is the contents of the following fourteen cellular telephone devices, described here and in more detail in Attachment A, collectively referred to hereafter as "the Electronic Devices":

  a. Red iPhone – Seized from table in living room at 619 Portland Street #2, St. Johnsbury, VT on 2/25/21 at 09:25 (item 9);[1]

  b. Black Verizon Smartphone – Seized from living room couch at 619 Portland Street #2, St. Johnsbury, VT on 2/25/21 at 09:35 (item 11);

  c. Blue Nokia Smart Phone with cracked screen – Seized from paper bag next to living room couch at 619 Portland Street #2, St. Johnsbury, VT on 2/25/21 at 09:44 (item 12a);

---

[1] Item numbers correspond to the St. Johnsbury Police Department's Evidence Collection Report, which I have reviewed.

d. Light Blue Samsung Galaxy S10e Smart Phone with clear backed case – Seized from paper bag next to living room couch at 619 Portland Street #2, St. Johnsbury, VT on 2/25/21 at 09:44 (item 12b);

e. Blue Samsung Smart Phone – Seized from paper bag next to living room couch at 619 Portland Street #2, St. Johnsbury, VT on 2/25/21 at 09:44 (item 12c);

f. Black LG Smart Phone – Seized from paper bag next to living room couch at 619 Portland Street #2, St. Johnsbury, VT on 2/25/21 at 09:44 (item 12d);

g. Black Verizon Smart Phone – Seized from paper bag next to living room couch at 619 Portland Street #2, St. Johnsbury, VT on 2/25/21 at 09:44 (item 12e);

h. Black Samsung Smart Phone – Seized from living room dresser (top drawer) at 619 Portland Street #2, St. Johnsbury, VT on 2/25/21 at 0950 (item 13a);

i. Black Q-Link Smart Phone – Seized from living room dresser (top drawer) at 619 Portland Street #2, St. Johnsbury, VT on 2/25/21 at 0950 (item 13b);

j. Black Verizon Smartphone – Seized from atop the bed in first bedroom at 619 Portland Street #2, St. Johnsbury, VT on 2/25/21 at 10:45 (item 25);

k. White iPhone in black Ghostek case with broken screen protector – Seized from top of bed in first bedroom at 619 Portland Street #2, St. Johnsbury, VT on 2/25/21 at 10:50 (item 27);

l. Black iPhone in black hardshell case – Seized from within yellow bag in the second bedroom at 619 Portland Street #2, St. Johnsbury, VT on 2/25/21 at 11:23 (item 37a);

m. White iPhone with cracked front screen and rear glass – Seized from within yellow bag in the second bedroom at 619 Portland Street #2, St. Johnsbury, VT on 2/25/21 at 11:23 (item 37b);

3

      n.   White iPhone in pink speckled case – Seized from within yellow bag in the second bedroom at 619 Portland Street #2, St. Johnsbury, VT on 2/25/21 at 11:23 (item 37c).

The applied-for warrant would authorize the forensic examination of the Electronic Devices and any digital storage contained within them, for the purpose of identifying electronically stored data particularly described in Attachment B.

5.     Based on the facts set forth in this affidavit, there is probable cause to believe that the Electronic Devices contain evidence of the knowing and willful distribution of controlled substances, in violation of 21 U.S.C. §§ 841(a), 841(b)(1)(C), conspiracy to distribute controlled substances in violation of 21 U.S.C. § 846, and use of firearms in the furtherance of drug trafficking crimes in violation of 18 U.S.C. § 924(c).  The Electronic Devices were seized on February 25, 2021 and are currently stored in evidence at the Vermont State Police Barracks evidence room in St. Johnsbury, Vermont.

6.     I am familiar with the facts and circumstances of this investigation from: (a) my own personal involvement in the investigation and my personal observations; (b) my review of documents and reports, and conversations with the Northeastern Vermont Drug Task Force (NEVDTF) and officers of the St. Johnsbury Police Department, and (c) my training and experience. Because this affidavit is submitted for the limited purpose of establishing probable cause for a search warrant, I have not set forth each and every fact learned by law enforcement during the course of the investigation.

## **PROBABLE CAUSE**

7.     On February 24, 2021, St. Johnsbury police officer Robert Gerrish applied for and was granted a search warrant by the Honorable Michael J. Harris, Caledonia County District Judge, seeking authorization to search unit #2 of 619 Portland Street St. Johnsbury, Vermont.  A true and

accurate copy of the affidavit is attached hereto as Exhibit 1, and its contents remain true and correct.

8.  On February 25, 2021, the state search warrant was executed at unit #2, 619 Portland Street, St. Johnsbury, Vermont. The warrant authorized law enforcement to seize property that included illegal narcotics, electronics, cellphones, tablets, computers, firearms, ammunition, and evidence of sale and dispensing narcotics.

9.  During the February 25, 2021 search warrant execution, law enforcement located approximately 138 grams of cocaine base, approximately 50 grams of fentanyl, additional quantities of bagged cocaine base, fentanyl and heroin, ten firearms, including two stolen firearms, and US currency, along with the Electronic Devices. As described below, these items were found in various locations throughout the residence.

10. Additionally, nine individuals were in the residence at the time of the search:

- Tyge R SEARL
- Heather POWERS
- Ariya SWEENEY
- Gary BOLTON
- Kyle GOODELL
- Paul DOWNER "Benji"
- Sherod HACKETT
- Jonathan HEADLEY
- Albert VIERA

Law enforcement arrested Paul Downer, "Benji," at the time of the search based on a preexisting state warrant for Downer's involvement in a January 2021 shooting in St. Johnsbury.

5

11.     Detective Steve Fauteux and Detective Sgt. Dustin Robinson of the Vermont Drug Task Force conducted a field-test of some of the suspected cocaine base and some of the suspected fentanyl. The field-tested samples were positive for the presence of cocaine and fentanyl.

12.     The Electronic Devices were located with and near the drugs, guns, currency, and individuals as explained below:

a. Living Room- In the living room couch, law enforcement located approximately 2 grams of suspected cocaine base stuffed between cushions and a Black Verizon Smartphone (item 11). On the living room table, law enforcement located $400 in currency, a dollar bill with approximately 1 gram of suspected fentanyl, two electronic scales,[2] the Red iPhone (item 9) and miscellaneous ammunition. Under the living room table, law enforcement found approximately 4.5 grams of suspected heroin, approximately 3.9 grams of suspected cocaine base, and 22 bags of suspected fentanyl. A brown paper bag located in the same room contained an additional five phones: the white Nokia Smart Phone (item 12a), the White Samsung Galaxy Smart Phone (item 12b), the Blue Samsung Smart Phone (item 12c), the Black LG Smart Phone (item 12d), and the Black Verizon Smart Phone (item 12e). In a dresser in the living room, law enforcement located two electronic scales, a Black Samsung Smart Phone (item 13a) and a Black Q-Link Smart Phone (item 13b). A black bag in the room contained two buprenorphine pills, an unidentified prescription bottle and a container with suspected cocaine base. Gary Bolton, Ariya Sweeny, Kyle Goodel, Tyge Searl, and Heather Powers were all in the living room at the time of the search. Albert Viera was in a closet in the next room.

b. First bedroom- The first bedroom held three beds and a dresser. On top of the first bed, law enforcement located the Black Verizon smartphone (item 25), a white iphone (item 27), a SW

---

[2] I am aware, based on my training and experience, that those involved in illegal drug trafficking often use scales to measure quantities of drug product for distribution.

6

M&P .45 pistol with a loaded magazine, and a Ruger 9mm handgun without a serial number with a loaded magazine. On the second bed, law enforcement located a Glock, .45 caliber firearm with an attached light and loaded magazine. On the third bed, law enforcement located a fanny pack with $6,250 in U.S. currency and a Ruger .357 Revolver. Law enforcement found 1.9 grams of suspected fentanyl, another SW M&P .40 caliber firearm with a loaded magazine, and an empty Beretta box and ammunition can with various ammunition and magazines in the dresser in the same room.

 c. Second bedroom- Next to the single bed in the second bedroom, law enforcement located a Delton AR-15 with one round and a magazine and a Scoped Windham weaponry AR-15 with a loaded magazine. Near the dresser in the same room, law enforcement located a bag containing $917 in U.S. Currency, over 138 grams of suspected cocaine base, 20 grams of suspected heroin, 30 grams of suspected fentanyl, 17 bags of suspected cocaine base, 25 bags of suspected fentanyl, an electronic scale, a Black iPhone (item 37a), and two White iPhones (items 37b and 37c). In and on the dresser, law enforcement located a Lorcin Model 25, .25 caliber firearm with an empty magazine, a Taurus .22 revolver, and two scales. On the floor nearby, law enforcement located a Springfield Armory case containing two magazines and ammunition. Paul Downer, Jonathan Headley, and Sherod Hackett were all in the room at the time of the search.

13. Based on my knowledge and experience and direct participation in investigations into the distribution of controlled substances, I know that:

 (a) Distribution of controlled substances can be lucrative, and individuals who engage in such conduct are capable of amassing tens of thousands of dollars or more in a short period of time and often physically retain such currency for long periods of time, even after their distribution activity has ceased;

 (b) It is common for drug dealers to possess or seek firearms to protect themselves and their controlled substances;

(c) It is common for sellers of controlled substances to put bank accounts, assets, and cell phones in the names of associates or fictitious names to avoid detection and to conceal illegitimate income;

(d) Controlled substance traffickers maintain and access books, records, receipts, bills of sale, notes, ledgers, computer software, airline tickets, money orders, and other documents relating to the transportation, acquisition, and distribution of controlled substances and proceeds, and much of this information is commonly stored electronically in Electronic Devices and other electronic devices capable of storing electronic data

(e) Traffickers in controlled substances commonly maintain names and contact information in books, ledgers, telephones, computers, personal digital assistants (PDAs), electronic devices and other digital devices, and digital storage media, which reflect the names addresses, telephone numbers, and email addresses of their drug trafficking associates;

(f) Persons involved in large scale drug trafficking keep and access electronic records of the storage, purchase, and/or trading in large amounts of currency, financial instruments (including stocks, bonds, certificates of deposit, etc.), precious metals, jewelry, automobile titles, other items of value and/or proceeds of drug transactions and evidence of financial transactions relating to the attainment and concealment of large sums of money, i.e. bank statements, check registers, financial account statements, wire transfer records and documentation of foreign bank accounts, acquired from engaging in narcotic trafficking activities; these items are often stored inside their Electronic Devices long after they cease trafficking in drugs;

(g) When drug traffickers amass proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits, i.e., "launder" the profits. To accomplish these goals, drug traffickers many times utilize domestic and foreign banks and/or financial institutions with their attendant services, including sales of securities, cashier checks, money drafts, money orders, letters of credit, etc. Other entities used to "launder" monies include brokerage houses, real estate firms, shell corporations and purported legitimate business fronts. Electronically stored evidence of their attempts to legitimize or "launder" the proceeds is commonly secreted within the electronic storage of their Electronic Devices long after they cease trafficking drugs;

(h) Persons engaged in criminal activity often spend the proceeds of their criminal activity and maintain or access records of their expenditures on their Electronic Devices, long after their criminal activity has ceased. They also maintain electronic records reflecting communication with their criminal associates. Specifically, these records may include the following;

i. Records of income and expenses, such as profit and loss statements and income and expense journals that reflect the expenditure of the proceeds of criminal activity;

ii. Evidence of the expenditure of the proceeds of criminal activity or purchase of assets with the proceeds of criminal activity, such as invoices, receipts, rental statements, lease statements, travel records, earnest money agreements, escrow statements, and real estate deeds:

iii. Records of the accumulation of assets acquired with the proceeds of criminal activity, such as ledgers, balance sheets and financial statements, reflecting both assets and liabilities;

iv. Checking and savings account records consisting of monthly statements, duplicate deposit slips, and canceled checks reflecting the deposit an disbursement of the proceeds of criminal activity;

v. Letters and other documents reflecting communications between partners or associates, such as address and phone books reflecting the names and addresses of partners or associates, phone billing records reflecting telephone activity, contracts and other agreements reflecting associates between individuals relative to business ventures, and cashier's checks, money orders, and wire transfers that are evidence of transactions involving the proceeds of criminal activity;

vi. Drug traffickers frequently take or cause to be taken, photographs of themselves, their associates, their property, and their product. These traffickers usually maintain these photographs electronically in their Electronic Devices. I know, based on my training and experience, that federal courts have recognized that unexplained wealth is probative evidence of crimes including trafficking in controlled substances.

22. Based on my training and experience, I use the following technical terms to convey the following meanings:

a.      Cellular telephone: A cellular telephone (or mobile telephone, or wireless telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A cellular telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, Electronic Devices offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Electronic Devices may also include global positioning system ("GPS") technology for determining the location of the device.

b.      PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication Device and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device. PDAs also often contain digital cameras.

c.      Smart Phone: Smart phone is a term typically used to refer to a cellular telephone that has combined the capabilities of a typical cellular telephone and a typical PDA.

d.      Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a

10

separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

e.  GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation Device can give a user driving or walking directions to another location. These Device can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

f.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g.  Internet: The Internet is a global network of computers and other electronic Device that communicate with each other. Due to the structure of the Internet, connections between Device on the Internet often cross state and international borders, even when the Device communicating with each other are in the same state.

23.  Based on my training and experience, I know the Electronic Devices are Smart Phones, and include the features outlined above.

24. In addition, I submit that there is probable cause to believe records may be stored on the Electronic Devices for at least the following reasons:

>   a. Based on my knowledge, training, experience and discussions with other law enforcement officers, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer or smart phone, the data contained in the file does not actually disappear; rather, that data remains on the device's storage medium until it is overwritten by new data.
>
>   b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the storage medium that is not currently being used by and active file – for long periods of time before they are overwritten. In addition, a device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.
>
>   c. Wholly apart from user-generated files, computer storage media – in particular, a device's internal hard drives – contain electronic evidence of how a computer has been used, what it has been used for, and who has used it (user attribution). To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Device users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.
>
>   d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into temporary Internet directory or "cache."

25. As further described in Attachment B, this application seeks permission to locate not only digital files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how the device was used, the purpose of its use, who used it, and when it was used. There is probable cause to believe this forensic electronic evidence will be on the Electronic Devices for the following reasons:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage Device or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created, and the sequence in which they were created, although this information can later be falsified.

b.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus spyware and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial

13

evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicting when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.      A person with appropriate familiarity with how a cellular telephone works can, after examining this forensic evidence in its proper context, draw conclusions about how a cellular telephone was used, the purpose of its use, who used it, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a cellular telephone was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

26.    Based on the facts set forth in this affidavit and in Exhibit 1, there is probable cause to believe that the Electronic Devices contain evidence of the knowing and willful distribution of

controlled substances, in violation of 21 U.S.C. §§ 841(a), 841(b)(1)(C), conspiracy to distribute controlled substance in violation of 21 U.S.C. § 846, and use of firearms in the furtherance of drug trafficking crimes in violation of 18 U.S.C. § 924(c).

27. Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

28. Based on the foregoing, I submit probable cause exists to search the Electronic Devices, more specifically described in Attachment A, for the evidence delineated in Attachment B.

Dated at Burlington, in the District of Vermont, this ___9___ day of March, 2021.

TFO Wade Cochran
Federal Bureau of Investigation

Sworn to and subscribed before me this ___9th___ day of March, 2021.

John M. Conroy
United States Magistrate Judge